APRIL L. HOLLINGSWORTH (Bar No. 9391)
LAUREN I. SCHOLNICK (Bar No. 7776)
**STRINDBERG SCHOLNICK & CHAMNESS, LLC**
426 North 300 West
Salt Lake City, Utah 84103
Telephone: (801) 359-4169

ELIZABETH M. PECK (Bar No. 6304)
**LAW OFFICE OF ELIZABETH M. PECK**
422 North 300 West
Salt Lake City, UT 84103
Tel. (801) 521-0844
Fax (801) 521-7725

Co-Counsel for Plaintiff Jeffrey Hansen

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **JEFFREY HANSEN,**<br><br>Plaintiff,<br><br>vs.<br><br>**HARPER EXCAVATING, INC.; REGENCE BLUECROSS BLUESHIELD OF UTAH,**<br><br>Defendants. | **PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:05-CV-940 DAK<br>Judge Dale A. Kimball |

Plaintiff Jeffrey Hansen ("Hansen") moves this Court for Summary Judgment

against Defendant Harper Excavating, Inc. ("Harper") pursuant to Rule 56(c) of the

Federal Rules of Civil Procedure. There are no genuine issues of fact in dispute to

preclude entry of judgment in favor of Hansen and against Harper regarding Hansen's

ERISA and COBRA claims at issue herein.

## STATEMENT OF UNDISPUTED FACTS

1.   Hansen is a former employee of Defendant Harper.  He was hired by Harper on or about November 24, 2003.  Amended Complaint, ¶ 9; Answer to Amended Complaint ("Answer"), ¶ 7; Henderson Dep. at 82:23-83:9, & its Exs.7, 20.[1]

2.   Harper was the Plan Administrator of the health insurance plan, provided by Blue Cross Blue Shield ("BCBS"), which Harper provides to its employees (referred to hereafter as the "Plan"). Amended Complaint, ¶ 10; Answer ¶ 8.

3.   Hansen was a plan participant and/or reasonably expected to be a plan participant of the employee benefits plans offered by Harper.  Henderson Dep., at Ex. 24, p.5 (Harper's Response to Interrogatory No. 5).

4.   During Hansen's orientation at Harper, Harper provided him with a form to sign titled "Harper Companies Insurance Benefit Disclosure & Acknowledgement [sic]." Hansen Dep., Ex 5 p.2; Henderson Dep., at 82:1-25; Grissetti Dep., at 54:1-55:16.

5.   The Benefit Disclosure & Acknowledgement form, which Hansen signed

---

[1] Relevant excerpts from the Depositions of Stacey Henderson, John Grissetti, and Jeffrey Hansen are attached here as Exhibits A, B and C, respectively; the exhibits used in the depositions are referenced herein are attached here as Exhibits D (Depo. Exs. 3-7), E (Depo. Exs. 20-21), F (Depo. Ex. 22, pp. 46, 48-50) and G (Depo. Ex. 24).  Each of the depositions used the same set of exhibits, consecutively numbered 1 through 24.

on November 24, 2003, stated, "All full time regular employees are eligible for benefits beginning on the 1st day of the month following 90 days of employment."   Hansen Dep., Ex. 5 p.2; Henderson Dep., at 67:2-69:3, 82:1-25; Grissetti Dep., at 57:9-23, 58:16-59:10 & its Ex. 21.

6.   Hansen completed and submitted application forms to enroll in the health, dental, vision, and accidental death insurance plans offered by Harper.  Hansen Dep., Exs. 5, 7; Henderson Dep., 73:7-13; 102:21-103:7.

7.   Hansen's application for dental and vision benefits dated March 9, 2004 was accepted.  Henderson Dep., 73:11-13, 103:4-7, 111:8-12; Henderson Dep. Ex. 24 (Response to Interrogatory No. 5).

8.   Hansen also submitted an application for health benefits dated March 9, 2004. Amended Complaint, ¶ 18; Answer ¶ 14; Hansen Dep., Ex. 7.

9.   After Hansen submitted his application for health insurance, Harper's employee in charge of benefits, Stacy Henderson, provided Hansen with the group numbers of the policy for which he was signing up. Amended Complaint, ¶ 19; Answer ¶ 15; Henderson Dep., 28:6-8; 78:13-80:24; Hansen Dep., Ex. 6; Grissetti Dep., at 56:6-20.

10.  Henderson treated Hansen's application as though Hansen was subject to only a 60-day waiting period.  Henderson Dep., 18:7-24; 67:13-68:14; 82:23-83:21; 89:5-9.

11.  Henderson listed the "Effective Date" of Hansen's health insurance application as February 1, 2004, and submitted the application to BCBS.  Hansen Dep.,

Ex. 7; Henderson Dep., 89:5-9.

12.   There are no documents that state that Harper employees were subject to a 60-day waiting period in 2003 and 2004, and Harper has not produced any documentary evidence to suggest that the 90-day probationary period expressed in the Benefit Disclosure & Acknowledgement form signed by Hansen was supplanted or replaced by a 60-day probationary period.  Henderson Dep., 61:19-62:1, 67:22-69:3, 86:18-90:3; 126:4-9.

13.   Beginning with the pay period ending March 6, 2004, Harper began making deductions from Hansen's paychecks for dental and health insurance premiums, for coverage retroactive to February 1, 2004.  Harper doubled Hansen's premiums in order to get his coverage backdated.  Henderson Dep., 99:21-102:20.

14.   Hansen's application for medical insurance, however, was subsequently denied.  Henderson Dep., 102:21-103:7.  On or about March 18, 2004, Harper's health insurance provider, BCBS, notified Harper that Hansen's enrollment was untimely. Henderson Dep., 103:8-13.

15.   Because BCBS denied Hansen's application, Hansen never received insurance benefits other than dental and vision.  Henderson Dep., 104:13-15.

16.   BCBS' assessment that Hansen's application was untimely was based upon Harper's representation on Hansen's application that he was subject to only a 60-day waiting period rather than the 90-day period of which Harper had informed him.

4

Henderson Dep., 94:24-95:13.

17. If Harper had applied the 90-day policy to Hansen's application, his application would have been considered timely. Henderson Dep., 94:24-95:13.

18. During Hansen's employment with Harper, Harper did not notify Hansen that his insurance application had been declined by BCBS. Henderson Dep., 96:4-17; 105:13-106:3. Harper did not notify Hansen that his insurance enrollment had been declined until June 2, 2004, almost three months after BCBS declined coverage. Henderson Dep., at 103, 105. Henderson testified that it was the employee's obligation to check up on insurance, and that she did not have an obligation to let Hansen know in a timely manner that he was not covered by Harper's health care benefits plan. Henderson Dep., at 109-110.

19. Despite the fact that it received notice that Hansen's application for insurance benefits had been denied, Harper continued to deduct monies from Hansen's paychecks as premiums for his health insurance throughout the rest of his employment with the company. Amended Complaint, ¶ 23; Answer, ¶ 18; Henderson Dep., 103:20-25.

20. Hansen terminated his employment with Harper on or about April 26, 2004. Answer, ¶ 19.

21. Since his termination, Hansen has been hospitalized several times. Hansen Dep., 84:17-96:17; Amended Compl., at ¶¶25-33; Answer, ¶¶ 25, 31-33.

22.   Because he does not have health insurance, Hansen has been unable to obtain medical treatment that his doctors have recommended.  Hansen currently suffers from significant medical problems, including back problems and glaucoma, that have been exacerbated by Harper's failure to enroll him in its health insurance plan.   See, e.g., Hansen Dep., 132:5-143:13.  For instance, Hansen is now blind in one eye due to his untreated glaucoma, and he is still unable to work as a diesel mechanic due to ongoing back problems.  Affidavit from Dr. Jackson, attached as Exhibit "H;" Hansen Dep., 132:5-12.

23.   Even though Hansen was signed up for dental coverage, and despite Hansen's requests for COBRA, Harper never sent him a COBRA notification.  Henderson Dep., 73:17-74:18; Hansen Dep., 73:21-75:4.

24.   On or about June 4, 2004, more than five weeks after his termination, Henderson informed Hansen for the first time that he was not covered by Harper's health insurance plan. Henderson Dep., at 106.  On June 4, 2004, Harper sent Hansen a check in the amount of $279.91 as reimbursement of the insurance premiums deducted from his paychecks.  Henderson Dep., 104:1-9.

25.   As a result of his lack of health insurance, Hansen has incurred thousands of dollars in necessary medical expenses that should have been paid for by the insurance policy for which he applied through Harper.  Hansen Dep., 108:8-109:22.  (Hansen has produced to Harper hundreds of pages of medical bills he has received pursuant to this

treatment. *See, e.g.*, Plaintiff's First Supplemental Answers to Defendant Harper Excavating's First Set of Discovery Requests, attached hereto as Exhibit "I.")

26.   Because of Hansen's current medical condition, he is unable to resume his former profession as a mechanic.  Accordingly, he has lost substantial capacity to earn future income.  Hansen Dep., 72:4-73:14; 95:12-99:16.

27.  On March 1, 2006, Hansen made a formal written request for Plan documents to the Plan Administrator, Harper, pursuant to 29 U.S.C. § 1132.  March 1st letter attached as Exhibit "J."

28.  In letters dated March 3, 2006 and April 28, 2006, Harper's attorney responded that it was not required to produce the Plan documents.  March 3rd and April 28th letters from Rust attached as Exhibit "K."

29.  Harper did not produce any plan documents to Hansen until after Hansen filed a Motion to Amend Complaint on May 1, 2006, stating his intention to file an additional claim alleging an ERISA violation based upon Harper's refusal to produce the documents.  May 2nd letter from Rust attached as Exhibit "L."

30.    The relevant provisions of the Plan documents relating to eligibility provide that an employee becomes eligible after he completes his probationary period, which period is determined by Harper.  (Ex. F attached here, at 46.)  The Plan further provides that en employee is entitled to initially enroll for coverage under the Plan within thirty (30) days of first becoming eligible for benefits.  (Ex. F, at 48-49.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P., Rule 56(c).  Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P., Rule 56(c); *see also*, Jachim v. KUTV Inc., 783 F. Supp. 1328, 1330 (D. Utah 1992).

## ARGUMENT

A.      *Hansen Has Standing to Sue Under ERISA*

As a threshold matter and pursuant to ERISA, Hansen as a "participant" has standing to bring a civil suit to enforce his rights under an ERISA plan or to enforce ERISA's provisions.  29 U.S.C. §1132; *see,* Alexander v. Anheuser-Busch Cos., Inc., 990 F.2d 536, 538 (10th Cir. 1993); *see also,* Horn v. Cendant Operations, Inc., 69 Fed. Appx. 421, *424 (10th Cir. 2003).  ERISA defines "participant" to mean "any employee or *former employee* of an employer, . . .  who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer." 29 USCS §§ 1002 (emphasis added).  The Supreme Court has defined the statutory term "may become eligible" as requiring proof that the claimant has "a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117-18 (1989); *see also* Uselton v. Commercial Lovelace Motor Freight, Inc., 940 F.2d 564, 581 n.16 (10th Cir.), cert. denied, 112 S. Ct. 589 (1991).

The standard for establishing a "colorable claim" is not stringent.  Hansen need only establish

that he has a nonfrivolous claim for health care benefits in order to establish his standing herein. *See e.g.,* Horn v. Cendant Operations, Inc., 69 Fed. Appx. 421, 426 (10th Cir. 2003); *see also,* Raymond v. Mobil Oil Corp., 983 F.2d 1528, 1533 (10th Cir. 1993). Based upon the undisputed facts presented here, Hansen made a nonfrivolous claim for health care benefits under the Plan. As more specifically set forth in the arguments below, Hansen was eligible for benefits during his employment with Harper. As indicated by the express notices given to him by Harper, Hansen made timely application for benefits, but his application was erroneously declined for having allegedly missed the enrollment period.

Upon hiring, Harper expressly notified Hansen that he became eligible for benefits on the first day of the month following his first 90 days of employment (the "probationary period"). Statement of Undisputed Facts ("SUF") ¶¶4-5. Once Hansen became eligible for benefits, Harper's policies and the Plan document provided that Hansen then had thirty days to enroll for benefits. *Id.*; SUF ¶30. Hansen complied with these policies by submitting an insurance application in the 30 days following the 90-day probationary period. At that point, however, Hansen was held to a sixty (60) day probationary period, of which he was given no notice. SUF ¶¶10-12, 14, 16, Hansen's enrollment application was therefore declined as being untimely, and his benefits were denied. *Id.* Whether the actual waiting period is 60 or 90 days, Hansen has a colorable claim against Harper for benefits due to its misrepresentation of the waiting period.

Further, the undisputed facts establish that when Hansen turned in his application, Harper provided him with group policy numbers and began deducting premium payments from Hansen's wages retroactive to a month prior to his benefits application. SUF ¶¶9, 13. Moreover, Harper continued these deductions throughout the remainder of Hansen's employment with the company,

notwithstanding the fact that BCBS informed Harper that it was denying Hansen's application.  SUF

¶¶14, 18-19.   Harper failed to inform Hansen that BCBS declined his application for health care

benefits until well after his termination, and after he began to suffer from medical conditions for which

he needed the benefits.  SUF ¶¶18-22, 24-26.  Based upon these facts, Hansen has demonstrated a

colorable claim for benefits, and his standing to sue under ERISA should be established as a matter of

law.

        *B.*        *Harper Breached its Fiduciary Duties to Hansen as the Plan Administrator.*

      Under ERISA, an employer may wear different hats - one as employer, and one as a  fiduciary.

In re Luna, 406 F.3d 1192, 1202 & n.8 (10th Cir. 2005); Varity Corp. v. Howe, 516 U.S. 489, 498

(1996).  An employer assumes fiduciary status to the extent that it "exercises any discretionary

authority or discretionary control respecting management of the plan, or has any discretionary

authority or discretionary responsibility in the administration of the plan." Varity Corp., 516 U.S. at

498; 29 U.S.C. §3(21)(A).  For instance, an employer that is a Plan Administrator is a "fiduciary,

owing obligations to plan participants."  Horn v. Cendant Operations, Inc., 69 Fed. Appx. 421, 427;

2003 U.S. App. LEXIS 13535, **14 (10th Cir. 2003); Varity Corp., 516 U.S. at 502-503 (a Plan

Administratory/employer acted as a fiduciary by providing information to its employees about benefits,

explaining the documents which provided such benefits, comparing various benefits plans, and assuring

employees regarding the security of their continued receipt of benefits relating to a subsequent transfer

of plans).

      A fiduciary under ERISA is charged with certain duties, including "a fiduciary duty to act

'solely in the interest of the participants and beneficiaries' for purposes of providing benefits and

administering the plan." 29 U.S.C. §1104(a)(1)(A); Horn, 69 Fed. Appx.. at 427, 2003 U.S. App.

LEXIS at **15.  A fiduciary is required to conduct its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.*; 29 U.S.C. §1104(a)(1)(B).

One of the duties ERISA specifically requires of administrators is that they "give beneficiaries certain information about the plan." *See,* Varity Corp., 516 U.S. at 502; 29 U.S.C. §102, 104(b)(1), 105(a).  The Tenth Circuit has held that the fiduciary has a duty to provide a beneficiary with material information:

> The duty to disclose material information is the core of a fiduciary's responsibility . . . ." Eddy v. Colonial Life Ins. Co. of [*428] Am., 287 U.S. App. D.C. 76, 919 F.2d 747, 750 (D.C. Cir. 1990); see also Harte v. Bethlehem Steel Corp., 214 F.3d 446, 452 (3d Cir. 2000); Shea, 107 F.3d at 628. A fiduciary's misrepresentation or failure to disclose is material "if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed . . . decision." Jordan, 116 F.3d at 1015 (quotation omitted); see also Harte, 214 F.3d at 451 ("ERISA was enacted, in part, to ensure that employees receive sufficient information about [**17] their rights under employee benefit plans to make well-informed employment . . . decisions."). Without sufficient information, plan beneficiaries may not be alerted that they should inquire further.

Horn, 69 Fed. Appx. at 427; 2003 U.S. App. LEXIS at **16; *see also,* Owen v. Regence BlueCross BlueShield of Utah, 388 F.Supp. 2d 1335, 1338 (D. Utah 2005).

Harper has acknowledged that it was the Plan Administrator during the time frame relevant to this lawsuit.  SUF ¶2.  Therefore, Harper is a fiduciary to its employees, including Hansen.  Harper's duties as a fiduciary include providing material information to its employees regarding their eligibility for Plan benefits, educating them as to their enrollment requirements, arranging and managing the deduction of premium payments from its employees' wages, managing enrollment applications and claims submissions to BCBS, and providing other material notices and information to its employees

relating to the Plan.  SUF ¶¶2, 4, 6-7, 9-11, 13, 16-18, 23-24, 30.

Pursuant to these duties, at his orientation, Harper provided Hansen with the "Harper Companies Insurance Benefit Disclosure & Acknowledgement [sic]," which states that "all full time regular employees are eligible for benefits beginning on the 1st day of the month *following 90 days of employment*."  SUF ¶¶4-5 (emphasis added).  Hansen acknowledged this policy by signing the document on November 24, 2003.  *Id.*  This, and Harper's "Payroll & Philosophies" forms are the only documents Hansen ever received which establish the waiting period for eligibility for benefits.  SUF ¶¶4-5.  Indeed, these are the only two documents produced in the course of this litigation that do so. *Id.*

There can be no dispute that Harper's representation to Hansen that he was subject to a 90-day waiting period for benefits constitutes "material information" related to the Plan.  The date that an employee becomes eligible to apply for benefits is one of the most basic points that an employee must know in order to make informed choices about his participation in the Plan.  And yet, this information was not just "likely," but guaranteed, to mislead Hansen in making an adequately informed decision.  For Harper now maintains that Hansen was subject to a 60-day, not a 90-day waiting period.  (It is not disputed that Hansen had 30 days from the start of the eligibility period to apply for benefits.)  SUF ¶30.  Having applied on March 9, 2004, more than thirty days after the purported sixty day eligibility period, Hansen's application was deemed late, and denied.  If the 90-day period had been applied to his application, Hansen's eligibility would have begun March 1, 2004, and his application would have been timely.  SUF ¶17.

Because Harper represented to Hansen that he was subject to a 90-day eligibility period, and Hansen acknowledged this representation in writing, which was effectively a contract, Harper is

prevented from subsequently imposing a 60-day period.  Member Servs. Life Ins. Co. v. Am. Nat'l
Bank & Trust Co. of Sapulpa, 130 F.3d 950, 956 (10th Cir. 1997); Bartlett v. Martin Marietta
Operations Support, Inc. Life Ins. Plan, 38 F.3d 514, 517 (10th Cir. 1994).  The Plan provides that
employees become "eligible to apply for coverage on the date [employee has] worked for [Harper]
long enough to satisfy any probationary period." SUF ¶30.  The Plan further instructs employees to
"see Your group administrator to find out Your Group's actual probationary period for coverage."
**Cite**  In fact, the example provided by the Plan to determine eligibility and enrollment time uses the 90
day probationary period as an example.  *Id.*  According to the terms of the Plan, and in keeping with
Harper's express notice of eligibility requirements and enrollment periods, Hansen abided by the Plan's
terms and he made timely application for benefits.

Regardless of whether the 60-day or 90-day period was ultimately correct, it is clear that at
some point, in its fiduciary capacity as plan administrator, Harper provided Hansen with materially
inaccurate information regarding his eligibility and enrollment requirements.  Horn, 69 Fed. Appx. at
427, 2003 U.S. App. LEXIS at **14; Varity, 516 U.S. at 501, 502-03.  In so doing, Harper breached
its fiduciary duties to Hansen.[2]

Further, Harper's breach of its fiduciary duties went beyond merely its failure to convey
accurate eligibility and enrollment requirements to Hansen.  Harper provided Hansen with group
insurance numbers and began deducting premiums from his paychecks, leading him to believe that he
had insurance.  Once Hansen's application for benefits was declined by BCBS for untimeliness, Harper

---

[2] *Cf.* Stacy Henderson's deposition testimony in which she asserted that it was Hansen's
obligation to check upon his insurance, and further, that she did not have an obligation to let
Hansen know in a timely manner that he was not covered by Harper's health care benefits plan.
Henderson is Harper's Insurance Coordinator and she is the primary person to whom all insurance
and benefits inquiries are made.  SUF ¶9.

never informed Hansen of the denial while he was employed at Harper.  Yet, Harper continued to collect premium payments from Hansen's paychecks until his termination on April 28, 2006 - almost two months after BCBS denied him coverage.  SUF ¶¶14, 19.  This was clearly a breach of several of its fiduciary duties.

Finally, Harper should have ensured that its head of benefits is informed not only of the correct probationary period, but that she is also aware of Harper's statutory obligations under COBRA and ERISA. Horn, 69 Fed. Appx. at 427; 2003 U.S. App. LEXIS at **16 (citations omitted).  Harper's failure to do so is, on its face, a violation of ERISA's "prudent man standard of care," another fiduciary duty.  29 U.S.C. §1104(a)(1)(B).

Based upon the undisputed facts, Harper breached many of its duties to Hansen, thus causing damage to him, as he was denied necessary health insurance coverage as a result of Harper's conduct. As a matter of law, Hansen should be awarded summary judgment against Harper for its breach of its fiduciary duties under ERISA.


C.      *Harper Is Estopped from Denying Hansen's Entitlement to Benefits.*

Hansen has a claim for estoppel, based upon the following: 1) Harper made misrepresentations and material omissions, through words or conduct, and with reason to know that Hansen would rely on those misrepresentations and omissions; and, 2) Hansen did in fact rely on Harper's words and conduct, and upon its misrepresentations and omissions, to his detriment. *See e.g.*, Miller v. Coastal Corp., 978 F.2d 622, 624-25 (10th Cir. 1992), cert. denied, 507 U.S. 987; Averhart v. US West Management Pension Plan, 46 F.3d 1480, 1486 (10th Cir. 1994); Swearingen v. Honeywell, Inc., 189 F. Supp.2d 1189, 1195-96 (D. Kan. 2002).

14

Although the Tenth Circuit has not officially recognized a claim for estoppel under ERISA, it has nonetheless "outlined a rudimentary framework of rules and elements to be followed when analyzing an equitable estoppel claim." Beach v. Mutual of Omaha Ins. Co., 229 F. Supp. 2d 1230, 1236 (D. Kan. 2002). Specifically, the Tenth Circuit has left open the notion that estoppel may be applied to ERISA claims in "egregious" or "extraordinary" circumstances as where the evidence shows "lies, fraud, or intent to deceive on the part of the defendant." *Id.,* citing Miller, 978 F.2d at 624-25 (10th Cir. 1992). Further, the Tenth Circuit has recognized the availability of an estoppel claim under ERISA when an employer plan administrator's representation constitutes an interpretation of an ambiguous term of an employee benefits plan. Averhart v. US West Management Pension Plan, 46 F.3d 1480, 1486 (10th Cir. 1994); Swearingen v. Honeywell, Inc., 189 F. Supp.2d 1189, 1195-96 (D. Kan. 2002).

Here, Hansen has presented undisputed facts regarding Harper's misrepresentations and deceptions. First, Harper misrepresented the length of the waiting period that determined the date of Hansen's eligibility for benefits. SUF ¶¶5, 10-12. Harper affirmatively represented to Hansen that he would become eligible for benefits after his *90*-day probationary period ended, and that he had 30 days following his eligibility date to apply for benefits. SUF ¶¶5-6, 28. The Plan even utilized a 90-day probationary period as its example to determine an employee's eligibility and enrollment requirements under the Plan. SUF ¶28. Nonetheless, instead of applying the 90-day probationary period, Harper arbitrarily and wrongfully applied a *60*-day probationary period in denying Hansen coverage. SUF ¶¶10, 12. Despite the express representation to Hansen that he was subject to a 90-day waiting period (and the fact that Hansen's application for benefits was timely pursuant to the 90-day period (SUF ¶17)), Harper apparently did not question BCBS' denial of Hansen's application as being untimely.

15

Harper's representation to Hansen regarding the length of the probationary period forms one of the bases for Hansen's estoppel claims. *See e.g.*, <u>Swearingen</u>, 189 F. Supp. at 1196. As a matter of law, Harper should be estopped from denying Hansen's eligibility for the Plan's benefits based upon Harper's representation of the Plan's terms relating to Hansen's probationary period.

In addition to Harper's failure to provide Hansen with accurate information relating to his eligibility and enrollment requirements to obtain benefits under the Plan, Harper affirmatively undertook actions to foster Hansen's belief that he was, indeed, covered by the Plan. Hansen has shown that he substantially and detrimentally relied upon Harper's representations.

When Hansen turned in his insurance application, Harper provided him with group numbers to use. SUF ¶9. Harper then began withdrawing premium payments from Hansen's weekly paychecks beginning with the date of Hansen's enrollment application, on or about March 9, 2004. SUF ¶13. The withdrawals were double the ordinary premium amount so as to backdate Hansen's coverage to February 1, 2004. *Id.* After Harper learned that BCBS had rejected Hansen's enrollment application on or about March 15, 2004 for untimeliness, Harper did not inform Hansen that he was not covered by Harper's health care benefits Plan. SUF ¶18. Rather, Harper continued to withdraw premiums from Hansen's paychecks for the duration of Hansen's employment with Harper. SUF ¶19. This conduct was a representation to Hansen that his money being deducted to pay for his health insurance benefits, when effectively, Harper was stealing from him, in complete disregard of the potential disastrous effects should Hansen become ill. (When asked why she did not stop the deductions when she received the letter, Harper's employee in charge of benefits replied, "Probably too many things to do. I couldn't tell you." SUF ¶19.)

It was not until approximately a month after Hansen was terminated, when he contacted

16

Henderson to ask why his insurance was being declined and how he could get COBRA, that Harper

first told him that he was not covered by Harper's health insurance benefits Plan. SUF ¶23-24. On

June 4, 2004, Harper sent Hansen (for the first time) a copy of the BCBS March 15 denial letter. *Id.*

By this time, Hansen had already begun to suffer from the health problems that have plagued him since

that date. He had been hospitalized once for his back problems, which were exacerbated by his

inability to get treatment at that time. SUF ¶¶22, 25. Meanwhile, glaucoma was slowly destroying his

eyesight. *Id.* Rather than try to assist Hansen in getting the benefits for which he had applied, Harper

sent him a check for approximately $279, representing the premium payments he had made for health

insurance coverage during the period March 9 through April 28, 2004. SUF ¶23-24. As a result of

Harper's conduct, Hansen has incurred thousands of dollars in medical bills, in addition to his

numerous health problems. SUF ¶¶22, 23, 25-26. Harper's conduct was "egregious," and the

circumstances which are undisputed here should be considered as "extraordinary" so as to estop

Harper from denying Hansen's eligibility for health care benefits. Beach, 229 F. Supp. at 1236-37.

In Beach, under facts similar to Hansen's case, the District Court of Kansas, applying 10th

Circuit law, determined that the employer plan administrator's knowing and/or reckless

misrepresentations as to coverage, were they to be ultimately proved, rose to the level of egregious

circumstances sufficient to state a claim for estoppel under ERISA. *Id.* Certainly, the undisputed

evidence cited above shows that Harper's conduct was deceitful towards Hansen, and that it made

affirmative and material misrepresentations and omissions to Hansen regarding his benefits and

eligibility for the plan. Harper should be estopped from denying Hansen's eligibility and entitlement to

the Plan's benefits as a matter of law.

17

    **D.**    *Harper Violated COBRA and ERISA in Failing to Provide Hansen with Notification of his Right to Continued Health Insurance Coverage*

The ERISA statute sets forth the laws governing employee benefit plans.  COBRA is an amendment to ERISA which was added "to guarantee that coverage under employer provided health insurance plans would be allowed to continue in certain circumstances where it would otherwise terminate."  Van Hoove v. Mid-America Building, 841 F. Supp. 1523, 1532 (D. Kan. 1993); 29 U.S.C. §1161, *et seq.*, 29 U.S.C. §1001, *et seq.*  COBRA provides that an employee, and other qualified beneficiaries covered by an employer's group health plan, have the right to elect to continue health care coverage for a period of up to 18 months following termination of employment.  "Qualified beneficiaries" are individuals who are beneficiaries under the health plan.  29 U.S.C. § 1167(3).  COBRA requires that an employer of an employee covered by a group health plan notify the plan's administrator of certain "qualifying events," including termination of employment, within 30 days of that event.  29 U.S.C. §1166(a)(2).  Once notified of the qualifying event, COBRA provides that the plan administrator has 14 days to provide the employee and qualified beneficiaries with notice of their rights to elect continued coverage under the plan. 29 U.S.C. § 1166(a)(4).  Furthermore, ERISA mandates that a plan administrator must mail the notification to a beneficiary who requests such information within 30 days of the request.  *See* ERISA § 502(c) (29 U.S.C. § 1132(c)) below.  If a plan administrator does not provide COBRA notification within 14 days of notification of the qualifying event, or 30 days from receiving a request from a beneficiary, a beneficiary is entitled to damages resulting from the failure to provide the notice, and a statutory penalty.  Section 502 of ERISA sets forth the enforcement provision for COBRA and ERISA as follows:

(a) . . .  A civil action may be brought  - -

    (1) by a participant or beneficiary ——
    (A) for the relief provided for in subsection (c) of this section, or
    (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

* * *

    (3) by a participant, beneficiary, or fiduciary
    (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or
    (B) to obtain other appropriate equitable relief
        (i) to redress such violations or
        (ii) to enforce any provisions of this subchapter or the terms of the plan;

(c) Administrator's refusal to supply requested information . . . .
    (1) Any administrator  (A) who fails to meet the requirements of paragraph (1) or (4) of section 1166 of this title [supra]. . .  with respect to a participant or beneficiary, or (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132.  In July 1997, the maximum amount of the penalty established under (c)(1) was increased to $110 per day.  *See* 29 C.F.R. 2575.502c-1.

    As an employee of Harper, Hansen was provided dental and vision benefits under the company's group health plan from March 1, 2004 until his employment with Harper terminated on or about April 26, 2004. SUF ¶¶6-7, 15.  Harper was the Plan Administrator of its group health plan for purposes of ERISA and COBRA.  SUF ¶2.  As the Plan Administrator, Harper had the statutory and fiduciary[3] responsibility to provide all notices to Hansen of his rights under COBRA and ERISA.  *See*

---

    [3] Under ERISA, health care plan administrators owe a fiduciary duty to plan beneficiaries. *See* 29 U.S.C. § 1104.  A fiduciary must "discharge his duties . . . with the care, skill, prudence, and diligence" of a "prudent man."  Id.  One of the fiduciary's duties is sending COBRA

19

*e.g.,* Jachim v. KUTV Inc., 783 F. Supp. 1328, 1332-33 (D. Utah 1992); Smith v. Rogers Galvanizing Co., 128 F.3d 1380, 1383 (10th Cir. 1997).  Having had actual notice of Hansen's termination as of April 26, 2004, Harper  was required to provide written COBRA notice to Hansen of his right to elect continuation coverage no later than May 12, 2004.  *See,* 29 U.S.C. §1166(c);  *see also,* Ward v. Bethenergy Mines, Inc., 851 F. Supp. 235, 237-38 (S.D. W.Va. 1994) (the plan administrator's obligation to notify a plan participant of his continuation rights arises upon receiving information of the qualifying event.)

It is undisputed that Harper did not send *any* notification, ever, to Hansen regarding his COBRA rights.  SUF ¶23.  Hansen has incurred significant medical expenses because he does not have dental and vision insurance.  SUF ¶¶22, 25-26.  By failing to provide timely notice to Hansen of his rights to continuation coverage under Harper's group health plan, Harper violated COBRA as a matter of law.  *See,* 29 U.S.C. §§1165(a)(1), 1166(a)(2),(4) and (c), 1167(3)(B).  As the Plan Administrator, Harper is liable to Hansen for his damages and the statutory penalty provided for under ERISA.  29 U.S.C. §1132(c); Van Hoove, 841 F. Supp. at 1532.

     E.     *Harper Violated ERISA in Failing to Provide the Plan Documents Upon Request.*

On March 1, 2006 and in the course of this litigation, Hansen made written request for the Plan documents.  SUF ¶27.  On March 3, 2006 and subsequently on April 28, 2006, Harper refused to provide the Plan documents, claiming that Hansen was not entitled to them.  SUF ¶¶28.  ERISA provides that,

> Any administrator . . . (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . by mailing the material . . . within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of $100 a day from the date of such failure or refusal . . . .

_____

notification.  Van Hoove v. Mid-America Building Maintenance, Inc, 841 F. Supp. 1523, 1536 (D. Kan. 1993).  .

29 U.S.C. §1132(c)(1)(B).[4]  Hansen's request for the Plan documents was unambiguous and specifically related to the issues and defenses raised in this lawsuit.  Harper had, or reasonably should have had a clear understanding as to what was requested; in fact, it appears that Harper's basis for the denial was its position that Hansen was not entitled to the documents.  SUF ¶28.  Any assertions that Harper was unclear of what was being requested is undermined by its own rationale for denying production of the documents for lack of Hansen's entitlement.  Ultimately, on May 1, 2006, Hansen moved to amend his Complaint to include a claims for civil penalties associated with Harper's failure to provide him with copies of the Plan documents.  Upon receipt of Hansen's motion, and in response to his amendment, Harper finally agreed to produce a copy of the Plan documents.  SUF ¶29.  Under these circumstances, imposition of the civil penalty is warranted, and should be applied on a per diem basis from March 3, 2006 (the date of Harper's first refusal) to at least May 2, 2006 when Harper finally agreed to produce the documents.

## CONCLUSION

Based upon the foregoing points and authorities, Hansen respectfully asks this Court to award him summary judgment against Harper for its breach of its fiduciary duties in its role as Plan Administrator, and for judgment decreeing that Harper is estopped from denying Hansen's entitlement and eligibility for Plan health care benefits.  Hansen further seeks summary judgment awarding him civil penalties under ERISA and COBRA for Harper's failure to provide him a COBRA notification regarding his dental and vision benefits, and its refusal to timely provide him with the Plan documents.  Upon award of judgment, Hansen should be entitled to the relief sought in his Amended Complaint as a matter of law, including his reasonable attorney's fees and costs incurred herein.

---

[4]So long as the request was so vague or ambiguous so as to subvert justice and fairness, the civil penalty may be applied.  *See*, Banks, 313 F. Supp. 2d at 1107 (citations omitted).

Dated this __31st__ day of __August__, 2006.


LAW OFFICE OF ELIZABETH M. PECK

By: _____/s/ Elizabeth M. Peck_____
Elizabeth M. Peck
Co-Counsel for Plaintiff


CERTIFICATE OF SERVICE


I hereby certify that on the __31ST__ day of August, 2006, I caused to be sent, via electronic filing, a true and correct copy of PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT to the following:

Timothy C. Houpt
JONES WALDO HOBROOK & McDONOUGH PC
170 So. Main Street, Ste. 1500
Salt Lake City, Utah 84101

Joseph C. Rust
Matthew G. Bagley
KESLER & RUST
2000 Beneficial Life Tower
36 So. State Street
Salt Lake City, UT 84111


_____/s/____Elizabeth M. Peck_____